Daniel O'Madigan, Jr., and Marjorie O'Madigan v. Commissioner.
O'Madigan v. Commissioner
Docket No. 66433.
United States Tax Court
T.C. Memo 1960-212; 1960 Tax Ct. Memo LEXIS 77; 19 T.C.M. (CCH) 1178; T.C.M. (RIA) 60212; October 7, 1960
*77 1. Petitioner, in 1953, was an executive of General Motors. He undertook to obtain a dealership in St. Louis. Dan O'Madigan, Inc., was organized in 1953 to acquire the Pontiac dealership, and it issued class A and class B stock. General Motors purchased the class A stock. Petitioner purchased the class B, nonvoting stock, for $85,000. Petitioner was president. Within one year, General Motors, in 1954, exercised its right under an agreement to dismiss the petitioner and advised him that his class B stock was worthless. After negotiations, General Motors paid $10,000 to petitioner, and petitioner surrendered his stock. Held: The class B stock cost $85,000; it was sold in 1954 for $10,000, and at a loss of $75,000; the loss was a long-term capital loss, deduction for which was limited to $1,000. 2. Petitioner expected to remain in St. Louis. He listed his house in Michigan with an agent for sale and at the same time rented it. He paid the wages of 2 houseworkers and 2 gardeners so that the property would be in the hands of caretakers and maintained in good condition to show prospective buyers. Held, on the facts, that the wages were ordinary and necessary expenses for the production *78 of income, and, also, were ordinary and necessary business expense in renting the property, and are deductible under either section 162(a) or section 212, 1954 Code.
3. While petitioners' house was rented, there was a severe rainstorm, after which it was necessary to make repairs of and repaint the house. Held, one-half of the cost thereof is deductible as an expense of maintaining rented property. 4. Held: That addition to tax for a substantial underestimate of estimated tax is required by section 294(d)(2), 1939 Code. Carl E. Starkloff, Esq., 4053 Lindell Blvd., St. Louis, Mo., for the petitioners. Robert B. Pierce, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax for 1954 in the amount of $1,046.46, and made an addition to the tax of $739.07 for a substantial underestimation of estimated tax under section 294(d)(2), 1939 Code. The questions for decision are as follows: (1) Whether petitioner sustained an ordinary loss in a transaction entered into for profit under section 165(c)(2), 1954 Code, upon the termination of his employment by a corporation, with respect to his class B stock in the corporation, or whether there was a sale of the stock. If there was a sale, the loss is a long-term capital loss, deduction for which is limited by sections 165(f)(2) and 1211. (2) Whether the cost of making repairs to petitioners' rented property is deductible under section 162(a). (3) Whether expenditures for household workers and garden workers, while petitioners' house was rented, are nondeductible personal expenses, or business expenses deductible under section 162(a). (4) Whether, since there *82 was a substantial underestimation of estimated tax for 1954, there should be an addition to the tax under section 294(d)(2). Findings of Fact Some of the facts have been stipulated. They are so found. The petitioners are residents of Bloomfield Hills, Michigan. They filed their joint return for the taxable year with the district director of internal revenue at Detroit, Michigan. Since the issues relate to Daniel O'Madigan, Jr., he is referred to hereinafter as the petitioner. The joint return of petitioners for the calendar year 1954 was timely filed on April 6, 1955. An amended return was filed on July 15, 1955. A second amended return was filed on July 13, 1956. Issue 1 The petitioner for many years was an executive in the automobile industry, engaged in the sale of automobiles. In 1953, he was the assistant general sales manager of the PontiacDivision of General Motors in Pontiac, Michigan. In the spring of 1953, the petitioner began looking for a new business connection. He located in St. Louis, Missouri, a Pontiac automobile dealership, known as Byron B. Webb, Inc. It was a General Motors Corporation dealership. Petitioner expressed an interest in acquiring this *83 dealership to H. E. Crawford, general sales manager for the Pontiac Motor Division and the supervisor of all Pontiac Motors dealership franchises. Petitioner was advised that in order to obtain the dealership, it would be necessary for him to advance a certain amount of capital. However, petitioner's funds were insufficient. A policy of General Motors prohibited the petitioner's borrowing the necessary funds from outside sources. Therefore, it was agreed that the Motors Holding Division, a division of General Motors which finances dealerships (hereinafter referred to as General Motors) would join with him in making arrangements to acquire the dealership. It was necessary to carry on negotiations with Byron B. Webb, Inc., for the sale of its assets to a new corporation to be known as Dan O'Madigan, Inc.; to organize an acquiring corporation; to provide it with capital with which to purchase assets and commence operations; and for General Motors and the petitioner to enter into an agreement which would provide for his eventual purchase of all of the voting stock of Dan O'Madigan, Inc. It was contemplated that General Motors would finance and negotiate the transfer of the dealership *84 and assets from Byron B. Webb, Inc. It was agreed that when all of the basic arrangements were completed, the petitioner would serve as the president and operator of Dan O'Madigan, Inc., and would promote and operate the new dealership business. On July 24, 1953, a corporation, Dan O'Madigan, Inc., was incorporated under the laws of Delaware, and on July 31, 1953, it qualified under Missouri law. It is referred to hereinafter as the O'Madigan corporation. The total amount of authorized capital stock was 2,350 shares, having a par value of $100 per share, of which 750 shares were class A voting stock, and 1,600 shares were class B nonvoting stock. In about June 1953, there were negotiations between Byron B. Webb, Inc., and General Motors, acting on behalf of the O'Madigan corporation. On July 31, 1953, a sales agreement was entered into between Byron B. Webb, Inc., and the O'Madigan corporation whereby the former sold all of its assets which were necessary to operate the dealership, including used cars, machine and shop equipment, furniture and fixtures, parts and accessories, and supplies, for $127,142.44. Byron B. Webb, Inc., agreed to rent its building to Dan O'Madigan, Inc. *85 Petitioner resigned from the Pontiac Motor Division of General Motors in Pontiac, Michigan, as of July 31, 1953. Dan O'Madigan, Inc., issued 850 shares of its class B nonvoting stock to petitioner, for which he paid to the corporation $85,000 on August 1, 1953. The O'Madigan corporation issued 450 shares of its class A voting stock to General Motors for which it paid $47,500 to the O'Madigan corporation. General Motors loaned the O'Madigan corporation $47,500 at 5 per cent interest payable in three and one-half years. The total amount of funds held by Dan O'Madigan, Inc., was $180,000, of which $127,142.44 was paid to Byron B. Webb, Inc., and $52,857.56 was retained for its operations. On July 31, 1953, petitioner and General Motors entered into an option agreement which was a standard agreement between an operator of a dealership and the Motors Holding Division. The general nature of this agreement was to secure for General Motors the entire control of the dealership until such time as its investment, both debt and equity, had been returned. During this period the petitioner was to be the "operator". He was the president of the corporation, but he held his position only on a *86 trial basis because General Motors, holding all the voting stock, could remove him at any time, and it reserved the right to do so. The agreement, entitled "Option Agreement", designated the parties in the following way: General Motors (Motors Holding Division) was called the INVESTOR, and Dan O'Madigan, Jr., was called the OPERATOR. The preamble stated that the parties desired to provide for the purchase of their respective stock interests in the "Dealer Company", Dan O'Madigan, Inc. The agreement provided that General Motors gave to O'Madigan the right to purchase any number of the full shares of class A stock which it held upon the condition that such purchase could be made only from funds received by O'Madigan from the O'Madigan corporation as dividends or bonus. The purchase price of such stock was to be the book value as determined under a clause of the agreement. The agreement provided further, inter alia, that O'Madigan was obligated to apply all dividends on the class B stock and all bonuses received to the purchase of the class A stock. Any class A stock which was purchased was to be converted to a class B stock, it being understood that until the entire debt and equity *87 interest of General Motors was purchased, General Motors would hold all of the voting stock. General Motors, having all of the voting rights, reserved the power to terminate petitioner's relationship with corporation and the dealership at any time and for any cause by removing him from the office of president of the corporation. In this event, the option right to purchase the class A stock also would end and petitioner would be obligated to transfer his stock to General Motors at its then current book value to be determined under the agreement. If the book value was zero, he would receive $1. The agreement contained a formula for determining the book value of the class B stock on a given date. The formula provided, in part, that if the net worth of the corporation was less than 85 per cent of the total par value of all the outstanding stock and also less than 85% of the class A stock, then the book value of each share of class A stock would be determined by dividing such net worth by the number of shares of A stock outstanding, and the value of the B stock would be zero. The operation of the O'Madigan corporation continued for almost 1 year, at which time there was a deficit of *88 more than $68,000. On May 5, 1954, General Motors, through the board of directors of the O'Madigan corporation, terminated petitioner's relationship by removing him from the office of president. Because of the deficit, petitioner was not entitled to receive the return of any part of the $85,000 which he had paid for his class B stock other than one dollar. General Motors determined that the value of the class B stock was zero. On July 6, 1954, petitioner received a letter from General Motors stating that it desired to purchase all of his class B stock. Thereafter, representatives of General Motors requested petitioner to surrender all of his stock upon General Motors' payment of $1, the maximum required under the above agreement. Petitioner refused to surrender his stock. Petitioner expressed dissatisfaction and informally presented various claims against General Motors, including the allegation that the policies of the dealership had been misrepresented and that he had not received the cooperation from the representatives of General Motors to which he believed he was entitled. The petitioner entered into negotiations with representatives of General Motors with respect to his *89 claims. He made a demand for payment to him of at least $20,000 in satisfaction of his claims. Eventually, General Motors agreed to pay him $10,000, in full, which petitioner reluctantly agreed to accept. The parties have stipulated as follows: "On July 30, 1954, petitioner Daniel O'Madigan, Jr. sold all of his class B non-voting stock to General Motors Corporation, Motors Holding Division". On July 30, 1954, General Motors paid to the petitioner $10,000 for his class B stock; petitioner delivered to General Motors his duly endorsed stock certificates; and petitioner executed and delivered a general release of all claims against General Motors and a memorandum of sale. The general release provided in part as follows: "General Motors Corporation having agreed to purchase from the undersigned all the stock owned by the undersigned in DAN O'MADIGAN, INC., a Delaware corporation, at a price in excess of the book value thereof, one of the considerations of such agreement being the release by the undersigned of all claims, if any, existing in favor of the undersigned against either the said General Motors Corporation or the said Dan O'Madigan, Inc., and General Motors Corporation having *90 purchased the said stock and paid the agreed price, receipt of which is hereby acknowledged, * * *." It is a policy of General Motors to obtain a general release when a dealership is ended. The memorandum of sale provided, in part, as follows: "The undersigned hereby sells, transfers and delivers to General Motors Corporation, in consideration of the price of Ten Thousand Dollars ($10,000.00), receipt of which is acknowledged, all the right, title and interest of the undersigned in and to 850 shares of the Class B stock of DAN O'MADIGAN, INC., * * *." No suit or action has been instituted by petitioner against General Motors which is in any way related to this proceeding, and petitioner has never made any claim for damages of any type against General Motors arising out of his purchase and sale of his stock in Dan O'Madigan, Inc. to General Motors, Motors Holding Division, or out of the operation of Dan O'Madigan, Inc. The corporate entity of Dan O'Madigan, Inc. was not liquidated after General Motors acquired petitioner's stock. Rather, a new dealer was appointed, the dealer company was reorganized, and a continuity of operations was maintained. One reason why General Motors *91 paid $10,000 for petitioner's stock was to preserve the continuity of the operations of Dan O'Madigan, Inc. in order to make use of the net operating loss incurred by it and receive a tax benefit. In the joint return filed April 6, 1955, the petitioner originally claimed a cost basis of $85,000 for his stock in the O'Madigan corporation, a sales price of $10,000, and a long-term capital loss of $75,000. An amended return was filed on July 15, 1955, in which the petitioner reported the $10,000 received from General Motors Corporation as income and claimed an ordinary loss of $85,000. On July 13, 1956, the petitioner filed a second amended return in which he took the position that $9,999 of the $10,000 received from General Motors was for damages and was not taxable income, and he further claimed that $84,999 (cost of the Dan O'Madigan, Inc., stock minus $1) was an ordinary loss from a trade or business or a loss from a transaction entered into for profit, which was deductible in the full amount. The respondent determined that the first return filed by the petitioner on April 6, 1955, correctly reported petitioner's transaction with General Motors. He stated in the statutory deficiency *92 notice with respect thereto as follows: "In making this determination of your income tax liability, careful consideration has been given to your protest received July 13, 1956, and to your two claims for refund (amended and second amended returns). "The issue raised in your amended return and second amended return requesting a deduction in such returns of net amounts of $75,000.00 and $84,999.00, respectively, and requesting in your second amended return the exclusion from taxable income of $9,999.00, all incident to your surrender of the capital stock of Dan O'Madigan, Inc., to General Motors Corporation upon their payment to you of $10,000.00, has been given careful consideration and it has been determined that no additional deduction is allowable. It is held you correctly reported this transaction on your original return as a long-term capital loss of $75,000.00." Petitioner purchased the class B stock of the Dan O'Madigan corporation in 1953 for $85,000. He sold all of the stock in 1954 for $10,000 and sustained a long-term capital loss of $75,000. Since the capital loss exceeded his capital gains, deduction for the loss is limited to $1,000. Issue 2 Petitioner's home, *93 named While Pines, located at 340 Chesterfield Road, Bloomfield Hills, Michigan, is a colonial style structure, situated on approximately 1 3/4 acres of land. They own this property. The house has about 10 rooms, and on the grounds there are 165 trees and shrubbery. When, in the middle of July 1953, petitioner went to St. Louis, Missouri, petitioner's wife remained at their home until January 1954, when she went to St. Louis to reside with her husband. Petitioner returned to his house at Bloomfield Hills in the latter part of December 1953, and at this time he entered into negotiations to rent the house, furnished to John Jamison, a business acquaintance, who was employed by General Motors and had been transferred from the west coast to take petitioner's position at Pontiac, Michigan, after petitioner resigned. Jamison agreed to rent White Pines, furnished, on a month-to-month basis, for $250 per month, commencing in January 1954. Petitioner agreed that he would pay for all utilities and for the upkeep of the grounds. Petitioner was anxious to retain two maids, one of whom had been in his employ for a number of years, because the house was listed for sale with a firm of real *94 estate agents who were authorized to show the house. Also, since the Jamisons expected to be away from time to time, petitioner wanted to have the maids at the house. Petitioner and Jamison agreed that petitioner could sell the house at any time. Also, in the event the Jamisons purchased a house, they were free to leave White Pines. The Jamisons resided at White Pines for 4 months, until May 1954. They paid rent in the total amount of $1,000. Cecil Thrash, who was caring for some of petitioner's personal affairs while he was in St. Louis, occupied White Pines for 2 months, after the Jamisons left and until the petitioner and his wife returned in July 1954. Thrash paid petitioner $50 per month rent, or $100. The total amount of rent received by petitioner during 6 months was $1,100. Petitioner returned to the house and lived there because his employment in St. Louis ended. While White Pines was rented, the two houseworkers, day workers, kept the house in good condition so that it could be shown to prospective buyers, and they looked after the house when the Jamisons were away. Petitioner paid them $317 in wages. During April through June, 2 gardeners took care of the grounds. Such *95 work was necessary to maintain and conserve the property. Petitioner paid them $259.20 in wages. The total expense was $576.20. When the Jamisons and Thrash rented White Pines it was understood that the houseworkers and gardeners would do their work at petitioner's expense in order to maintain the property in good condition, and would look after it when they were away. On his income tax return, petitioner reported the rent received, and he took deductions for depreciation, repairs, taxes, and utility charges, as well as for the above wages. The respondent allowed all of the deductions except those for the above wages, which he disallowed. The houseworkers' and gardeners' wages were ordinary and necessary expenses paid in the taxable year for the maintenance and conservation of property held for the production of income, for the rental thereof, and for holding the property for sale. Issue 3 Petitioner's house is a shingled, 2-story structure with an attic floor sometimes called the third floor, which was built in about 1917. The shingles were painted white. It has a gabled roof which comes down over the front of the house to an edge which is on a level with the ceiling of *96 the second floor. On this lower edge of the roof rain gutters are attached. Petitioner has lived in the house since July 1949, except during the 6 months, January through June 1954, when the house was rented. The last time that petitioner had his house painted, prior to 1954, was in 1952. Normally, he would not have had the house repainted until 4 years later. During the evening of March 24 and morning of March 25, 1954, there was a storm and a heavy downpour of rain at, and in the area of, Bloomfield Hills. A report of the United States Weather Bureau at Detroit shows that during that night 1.81 inches of rain fell at Detroit City Airport, and 2.26 inches of rain fell at Willow Run Airport. At the time of this rainfall petitioner was in St. Louis. He was notified of the storm, and that the heavy rain had caused damage to the house, by Jamison, who telephoned to him. The rain dampened the plaster on the interior walls and ceiling of the master and west bedrooms on the second floor of the house, and caused yellow discoloration on the exterior walls in the front of the house. The walls of the west bedroom were replastered and repainted. It was necessary to repaint the front of *97 the house, at least. Petitioner had the entire house repainted. It was necessary to make various repairs. All of the work on the house was done and paid for during 1954. The total amount paid for all of the work was $2,261.33, of which $1,418.75 was paid to a painting contractor; $202.58 was paid for replastering and repainting the west bedroom; and $640 was paid for repairs. Petitioner deducted, for loss from a casualty, $1,130.67, one-half of the total amount expended, which was described as "water damage to house." The respondent disallowed the deduction. He gave the following explanation: "It is held that you are not entitled to the deduction * * * of $1,130.67, as a casualty loss from water damage to a personal residence." The petitioner did not receive any compensation from insurance or otherwise for the damage to his house from the severe rainstorm. The expenditure of $1,130.67 was for the maintenance of rented property. Issue 4 The petitioner filed a declaration of estimated tax for 1954 in which he estimated the tax at $800, and paid that amount with the declaration. He did not file an amended declaration, or file his final return by January 15, 1955, in lieu *98 thereof, although he knew by January 15 that there was a substantial underestimation of estimated tax in his declaration. In his final return for 1954, petitioner reported total salary receipts of $60,169.92, and income tax of $19,992.82. An addition to the tax under section 294(d)(2) is required for substantial underestimation of estimated tax. Opinion Issue 1 HARRON, Judge: The petitioner claims an ordinary loss deduction under section 165(c)(2), 1954 Code, [1] as a loss incurred in a transaction entered into for profit, although not connected with a trade or business. He contends that the loss was the result of General Motors' discharging him from the position of president of the O'Madigan corporation in May 1954, which action ended all prospects of his continuing with the automobile dealership, of his acquiring the dealership through purchase of the class A stock, and of realizing anything from his payment of $85,000 for the class B stock. It is petitioner's theory that when General Motors exercised its right to fire him, for any cause whatsoever, General Motors then brought about an involuntary forfeiture of the $85,000 which the petitioner had put into the venture with *99 the expectation of ultimately realizing a profit. The respondent contends that petitioner sold and General Motors bought his stock for $10,000; that there was a long-term capital loss of $75,000, and that under sections 165(f), and 1211(b) deduction for such loss is limited to $1,000. [2]
*100 The petitioner does not cite any case which is directly in point. He relies principally on C. G. Ganopuls, 39 B.T.A. 1120, where the facts do not resemble those of the instant case. That case has been considered. It is, on its facts, distinguishable from this case and does not apply here. Whether or not petitioner made a sale of his stock in the O'Madigan corporation is a question of fact under which the petitioner has the burden of proof. The record shows and it is concluded that the petitioner made a sale of the stock to General Motors. He executed a memorandum of sale on July 30, 1954; it states that he sold and delivered the stock to General Motors "in consideration for the price of" $10,000, receipt of which was acknowledged. Furthermore, in the stipulation of facts it is stated that petitioner "sold all his Class B non-voting stock to General Motors Corporation." Petitioner cannot avoid the tax effect of his actual transaction with General Motors whereby he sold the stock in question for $10,000, at a loss of $85,000. The loss was from the sale of a capital asset. It is allowable only to the extent of $1,000 under section 1211 because such loss exceeded his *101 capital gains. Petitioner's transaction with General Motors on July 30, 1954, when he received $10,000 and surrendered his class B stock, was on its face a sale or exchange of the stock. But petitioner seeks to avoid the tax consequences of a determination that there was a sale or exchange by arguing that General Motors' termination of his employment on May 5, 1954, caused his stock to become worthless on that date, and was the event which brought about his loss, so that even though the July 30, 1954, transaction was cast in the form of a sale, it should not be recognized as the event which brought about the loss, the loss having occurred on May 5th. It is with respect to this theory that the petitioner relies on the Ganopuls case, supra. In the Ganopuls case, the taxpayer purchased real estate under a land contract which provided that in case he defaulted in meeting its terms, the vendor could declare the contract void, retain whatever payments had been made, and take immediate possession. He defaulted. The vendor declared the contract forfeited, and notified him to surrender possession of the property. The taxpayer then executed and delivered to the vendor a quit-claim deed *102 of his interest under the contract and a release. This court held that since there was not a mutual agreement of the parties to cancel the land contract, and since the taxpayer's property rights were extinguished and terminated solely by the act of the vendor in declaring the contract forfeited, there was not a sale or exchange of the property; the vendor's declaring the contract forfeited brought about the loss; and the taxpayer's execution and delivery of a quitclaim deed "was not sufficient to change the previous forfeiture into a sale or exchange". (Page 1123) Petitioner contends that the Ganopuls case is similar to the instant case and that the same reasoning should be applied here, namely, that the exchange of the stock for $10,000 on July 30, 1954, did not change the previous loss (or forfeiture) into a sale or exchange of the stock. Petitioner argues that: "The subsequent sale [on July 30, 1954] established nothing." He urges that a practical, not a legal, test should be applied, citing De Loss v. Commissioner, 28 F.2d 803; and W. W. Hoffman, 40 B.T.A. 459, 460. By analogy to cases dealing with real estate losses, petitioner argues that the loss *103 involved here was not the result of the sale of his stock to General Motors for $10,000. In George Hewitt Myers, 3 T.C. 1044, 1048, we had the occasion to review cases dealing with the taking back of property by a creditor upon and after the debtor's default, and concluded that under the authority of Helvering v. Hammel, 311 U.S. 504; Electro-Chemical Engraving Co. v. Commissioner, 311 U.S. 513; Commissioner v. Coggan, 119 F. 2d 504, certiorari denied 314 U.S. 652; and Helvering v. Nebraska Bridge Supply & Lumber Co., 312 U.S. 666, the presence of a sale, in the sense in which Congress meant to employ it in section 117(d), 1939 Code, should not be questioned and should not be treated as without effect in considering whether section 117(d) applied. In the Myers case, the taxpayer relied, indirectly at least, upon C. G. Ganopuls, supra. We said with respect to that and similar cases: "All of these cases were decided prior to the Hammel case. See, also, Edward F. C. McLaughlin, 43 B.T.A. 528." We are unable to find any merit whatsoever in petitioner's attempt to avoid the *104 rule of the Hammel case which controls the issue here. Under the option agreement with General Motors, dated July 31, 1953, General Motors, Article III A, when petitioner ceased to be the president of the O'Madigan corporation, General Motors was either to purchase petitioner's stock or take steps to liquidate the corporation. It elected to purchase the stock under the provisions of Article IV, in the event General Motors should purchase the stock of petitioner, the price to be paid was the audited book value. The audited book value was zero. Under Article IV A3, General Motors was obligated to pay only $1 for the stock because its book value was zero. Petitioner refused to surrender his stock for $1; he made various claims against General Motors; and eventually received $10,000. The evidence does not establish that that amount was paid for anything other than the stock. In this respect, petitioner argues, further, that only $1 was paid for the stock, and $9,999 was paid by General Motors for a general release, or as damages. However, both contentions are founded upon arguments and theories of the petitioner, which are self-serving; they are wholly without the support of proof. We *105 must reject petitioner's theory as wholly without merit. It is concluded that, under the provisions of the option agreement, General Motors bought petitioner's stock for $10,000. The provisions of the option agreement of General Motors are such that it followed from the termination of petitioner's position as president of the O'Madigan corporation that General Motors purchased petitioner's stock. Under the rule of Helvering v. Hammel, supra, the definitive event fixing petitioner's loss was not the termination of his employment as president, which preceded General Motor's purchase of his stock; but, rather, the definitive event was the purchase for $10,000. Petitioner's loss was a long-term capital loss in the amount of $75,000. Issue 2 Whether or not petitioner is entitled to deductions for the wages paid to two household maids and to two gardeners during the time that his house was rented is chiefly a question of fact. If all or part of such expense was personal expense, it is not deductible. Petitioner is entitled to and the respondent has allowed deductions for expenses which were ordinary and necessary in connection with the rental of White Pines, which *106 he recognizes was held during part of the taxable year for the production of income. The question is presented under section 162(a) (trade or business expenses). However, it could be considered as arising under section 212 (expenses for the production of income). See, for example, Mary Laughlin Robinson, 2 T.C. 305, where a similar question was considered under the corresponding section in the 1939 Code, section 23(a)(2); and William C. Horrmann, 17 T.C. 903, 908. In both of those cases, deductions were allowed for the expenses of a caretaker and of utility charges under section 23(a)(2). Under Leland Hazard, 7 T.C. 372, 376, it has been held that when real estate is devoted to rental purposes, such use constitutes use of the property in trade or business even though the taxpayer devotes only one piece of property to such use. Anders I. Lagriede, 23 T.C. 508, 512. Whether the issue is considered under either section 162(a) or section 212, the question to be decided is whether the houseworker expense and the gardener expense were an *107 ordinary and necessary expense, because both sections provide that in order to be deductible the expense must be both ordinary and necessary. It is concluded that both expenses were ordinary and necessary, and we have so found. The expense for the services of 2 houseworkers was incurred and paid in connection with offering the house for sale. Each one worked on a different day; both were not employed on the same days. The property had been put on the market for sale before the Jamisons rented it on a month-to-month basis. It was understood that the Jamisons would be away on trips frequently. The real estate agent had a key to the house. The Jamisons were looking for a house to buy. Petitioner's property was too large. The house has 3 floors and 10 rooms. They were free to give up White Pines at any time. The petitioner and his wife had moved to St. Louis where petitioner believed he would be employed for several years. Under all of the circumstances, it was agreed when White Pines was rented to the Jamisons that both houseworkers should be employed so that when the Jamisons were absent temporarily, or if they moved out, the house would be looked after. Petitioner knew that the houseworkers *108 were trustworthy and he employed them while White Pines was rented both as caretakers and to maintain the house in good condition to show to prospective purchasers. We believe that the expense involved was an ordinary and necessary expense of attempting to sell the house and of renting a house which was up for sale while occupied by tenants. In Mary Laughlin Robinson, supra, p. 308, it was held that holding property for sale was holding it for the production of income. The same holding was made in the Horrmann case. The expense was also a necessary expense of renting the house, and here we think it was ordinary as well. The Jamisons had personal belongings in the house, and from their viewpoint it was desirable that if strangers were to go through the house when they were absent that someone be in the house. Allowing a real estate agent to show the house was for petitioner's benefit, not theirs. The expense of employing 2 houseworkers was not, under all of the circumstances a personal expense of the petitioner. Deduction of wages in the amount of $317 is allowable under either section 162(a), or section 212. The wages paid to 2 gardeners were ordinary and necessary *109 expense of both holding the property for sale and renting. The Jamisons would not have rented the property if they had been obliged to keep up and maintain in good condition the large grounds around the house; and when they rented the property, it was agreed that such expense would be paid by petitioner, just as the expenses of utilities would be paid by him. The expense was necessary to the petitioner to keep the property in a presentable condition in connection with his efforts to sell the property, and it was ordinary, as well, under all of the circumstances. Deduction of gardeners' wages in the sum of $259.20 is allowable under either section 162(a) or section 212. Issue 3 Petitioner contends that a severe rainstorm caused damage to his house and that his loss, measured by one-half of the cost of the repairs, is deductible under section 162(c)(3) as a casualty loss. In the alternative, he contends that one-half of the cost of repairs is deductible as an expense of maintaining the rented property. We need not consider whether there was a casualty loss because the expenses were ordinary and necessary both in holding the property for sale and in order to maintain rental property. *110 The damage occurred while the property was rented. The expense, in the amount of $1,130.67, one-half of the cost of the repairs, was an ordinary and necessary expense of carrying on the business of renting the property, and of conserving and maintaining property held for the production of income. The repairs expense are deductible under either section 162(a), or section 212(2). They were not capital expense. Issue 4 Petitioner filed a declaration of estimated tax for 1954. He estimated and paid with the declaration a tax of $800. This was a substantial underestimation of estimated tax. The amount of income tax which petitioner reported in his original joint return for 1954 was $19,992.82. In that return, total salary receipts were reported in the amount of $60,169.62, which included $18,787.93, received from Packard Motor Car Company after employment by the O'Madigan corporation ended. Petitioner failed to file an amendment to his declaration of estimated tax, and he did not file his final return for 1954 in lieu thereof by January 15, 1955, even though he knew before January 15 that the declaration did not properly reflect his full taxable income. The petitioner asserts that *111 his failures in the above respects were not willful. He argues that whether the Commissioner imposes an addition to tax under section 294(d)(2) is permissive and within his discretion. However, he does not cite any authority in support of his argument. Indeed, there is none because petitioner is in error. The respondent made an addition to tax under section 294(d)(2) in the amount of $739.07 because 80 per cent of the tax determined was in excess of $800, the tax paid under the declaration of estimated tax, plus amounts withheld from salaries. Section 294(d)(2) is mandatory in its imposition of the penalty. The penalty under section 294(d)(1)(A) can be avoided upon the ground of reasonable cause, but under section 294(d)(2), reasonable cause is irrelevant. H. R. Smith, 20 T.C. 663; Estate of Arthur Garfield Hays, 27 T.C. 358, 361. Also, in the latter case it was noted that section 6654 of the 1954 Code provides no aid because it "is not retroactive in its effect, and it is clearly amendatory, not declaratory of prior law." See, also A. E. Hickman, 29 T.C. 864, 878; *112 and Kaltreider v. Commissioner, 255 F. 2d 833. Respondent's determination that there should be an addition to the tax under section 294(d)(2) is sustained. The amount thereof will be recomputed under Rule 50. Decision will be entered under Rule 50. Footnotes
1. SEC. 165 Losses. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to * * *
(2) Losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * *
(f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212↩.
2. Sec. 1211. Limitation on Capital Losses. * * *
(b) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. For purposes of this subsection, taxable income shall be computed without regard to gains or losses from sales or exchanges of capital assets and without regard to the deductions provided in section 151 (relating to personal exemptions) or any deduction in lieu thereof. If the taxpayer elects to pay the optional tax imposed by section 3↩, "taxable income" as used in this subsection shall be read as "adjusted gross income".